MEL YOUEL, RESPONDENT, v. THE BANK OF ATCHISON COUNTY, AP-
PELLANT.—117 S. W. (2d) 376.

Kansas City Court of Appeals.  May 2, 1938.

*J. V. Gaddy* and *Clayton W. Allen* for respondent.

*W. L. Mulvania* and *A. F. Harvey* for appellant.

(1)

BLAND, J.—This is an action for money had and received. There was a verdict and judgment in favor of the plaintiff in the sum of $258.20 and defendant has appealed.

The facts show that plaintiff is a farmer, living near Fairfax, Atchison County; that defendant is a bank located at Rock Port in the same county; that C. G. McConnell was a resident of that county, residing on a farm and engaged in the business of buying and selling horses and mules; that on Saturday, February 1st, 1936, McConnell purchased of the plaintiff three mules for $495, for which he gave the plaintiff his check, drawn upon the defendant bank; that the check was not handed directly to plaintiff, but was left at a filling station where plaintiff procured it the following Monday morning. The check included $10 for a prior indebtedness owing the plaintiff by McConnell, growing out of the purchase of another mule, and consequently, it was made for $505.

Beginning in May or June 1935 McConnell began purchasing horses and mules for the Government, the defendant advancing the money to buy them, the Government later paying the defendant. Later McConnell started buying and selling horses and mules on his own account, handling the financial end of the transaction, with the bank, the same way that he had done before. McConnell would buy horses and mules from farmers and give them his check in payment for the same drawn on the defendant, and at the end of each week defendant would draw a draft on the Kansas City Horse and Mule Company covering the checks. Some of the horses and mules bought by McConnell were shipped to the Kansas City Horse and Mule Company and sold for him by it. However, others were sold to farmers. At times McConnell would keep, for a period of time, the horses and mules that he purchased, on his farm or on the lot that he owned in Rock Port.

When McConnell began to purchase horses and mules he had no balance in the bank and, even afterwards, at times, he would have overdrafts there. His bank account covered all of his transactions, both in the buying and selling of horses and mules, and included his checking account for personal expenses.

The mules purchased from plaintiff by McConnell were shipped by the latter to the Kansas City Horse and Mule Company on the day they were purchased and the check given by McConnell to plaintiff was presented for payment, without endorsement, to the defendant bank by plaintiff in person on the morning of Monday, February 3, 1936. Mr. Beasing, cashier of the bank, waited on plaintiff, took the check and examined it. On the bottom left-hand corner of the check was written the notation: "1 mule $180.00 1 Mule $165.00 1 Mule $150.00 Balance on Mule $10.00." After examining the check Mr. Beasing handed it to Mr. Boettner, president of the bank. Mr.

Boettner then examined the check and returned it to Beasing, who, in turn, handed it to plaintiff with the statement that "they were not paying Charley's checks any more." Plaintiff then said, "If that is the case, I had better get hold of Charley McConnell." Beasing said, "he is in Kansas City, I think," and plaintiff replied, "I know he is, he took my mules there."

Plaintiff then took the check to the Exchange Bank at Fairfax and deposited it in the usual way. The check was presented to defendant for payment and protested on February 7, 1936. Afterwards plaintiff received from McConnell $265 cash, which plaintiff applied, generally, on the check, but he had no understanding about the balance. The consignment of horses and mules in which plaintiff's mules were sold by the Kansas City Horse and Mule Company brought $1777.50; $150 of this went to the Nodaway Valley Bank, at Maryville and $1518.50, covered by a draft for $1100 and a check for $418.50, went to the defendant bank.

On January 17, 1936, one G. E. Sellers, deposited in the bank at Fairfax a check drawn by McConnell in his favor in the sum of $1125. After going the usual rounds it reached the defendant bank on January 21st. At that time there was not sufficient funds in the defendant bank to the credit of McConnell out of which to pay this check, so the cashier of the bank at Fairfax told Boettner not to protest the check but to hold it and the former would guarantee payment if sufficient funds did not arrive in a few days to pay the same.

On the morning of February 3, McConnell had to his credit in defendant bank the sum of $812.83. At that time McConnell had directed his employee, Myers to have defendant draw a draft on the Kansas City Horse and Mule Company in the sum of $500. On behalf of defendant, Myers testified that he went to the defendant bank about seven o'clock of the morning of February 3 and told Boettner or Beasing to draw the draft. This defendant did, and credited the amount thereof to McConnell's account. The amount of this draft, together with the $812.83 then to the credit of McConnell's account, was sufficient to pay the draft for $1125, and the same was applied to the payment of said draft, leaving a balance of only $187.83 to McConnell's account. Defendant's testimony tends to show that it was not until after this was done that plaintiff came to the bank. There is nothing in the record to contradict defendant's witnesses as to this transaction.

The officers of the defendant bank were well acquainted with the business of McConnell in the buying and selling of horses and mules. While, in some instances, McConnell would talk to one of the officers of the defendant in reference to the sale of horses and mules, he did not consult them each time he bought or sold animals and defendant did not know that he had purchased any mules from plain-

4

tiff prior to the latter's going to the bank and acquainting its officers with that fact.

On behalf of plaintiff McConnell testified: ''I don't remember how this $500.00 draft was caused to be drawn about the time the Youel mules were bought but it was drawn by the Bank of Atchison County and they got the money and put it in my account. I didn't direct that they pay·Youel out of that draft and so far as I know they had no knowledge when that draft was drawn, no information from me, that I had ever bought any mules from Youel. I did not make it a practice of informing them, unless it was sometimes John Smith's horses, what I was going to pay or where I was going to ship them and if they had means of acquiring that information it would be through someone else besides me.''

It appears that, in giving checks to farmers, when purchasing their animals, McConnell would make a notation upon the check, concerning the transaction, similar to the one upon the check given to the plaintiff. McConnell kept no books and the records of the bank were the only ones that were kept with reference to his transactions. It appears that it was the practice of the bank to pay out money upon checks drawn upon it by McConnell in the order in which they were presented. To refresh his memory as to ''how many drafts were drawn'' McConnell used a sales account, furnished him by the Kansas City Horse and Mule Company, covering the sale and the returns for the horses and mules bringing $1777.50. He did not attempt to use it in order to refresh his memory as to the amount that he received in the sale of plaintiff's mules (in fact the sales account did not so show), and he did not testify as to what that amount was. There was no evidence as to what money defendant received that came from the sale of plaintiff's mules.

There was no agreement that the check given by plaintiff was received as absolute payment for the mules purchased of him by McConnell. Therefore, until the check was paid, title to the mules did not pass.

If plaintiff was entitled to recover it was on the theory that the title to the mules remained in him, for the reason that he did not accept the check in absolute payment of the same and that, when the proceeds from the sale of his mules reached the bank, the money was his money and when the bank refused to turn it over to him he had an action for money had and received.

In this connection it was necessary for him to show, among other things, that the bank received the money with the knowledge that it was plaintiff's money and refused to pay it over on demand. In order for plaintiff to establish this, it was necessary for him to show the amount his stock sold for on the market at Kansas City, for the reason that the proceeds of the sale received by the bank included

returns from stock belonging to other persons and the total amount realized from the entire shipment might not have been enough to pay the outstanding checks given persons from whom McConnell had purchased the stock covered by the shipment. Of course, plaintiff could have shown that the amount realized from the sale of stock, and deposited in the bank, was in excess of the amount paid the various owners of the stock by McConnell, if such were the facts. In the absence of any testimony on this subject, he failed to establish what proportion of the fund in the bank's hands he was entitled to receive.

The instruction in the nature of a demurrer to the evidence should have been given. [Thomas v. Farmer's National Bank, 217 S. W. 860.] The facts in the case of State ex rel. v. Trimble, 289 S. W. 796, are not like those in the case at bar.

Plaintiff's witness, Strickler, testified that shortly before February 3, 1936, he sold some horses and mules, or both, to McConnell and, over the objection of defendant, that in February 1936, he had three of McConnell's checks in his possession "but only two of them for that shipment. Some of the checks were held up for payment. I called over the telephone when one check was turned down, talked to Mr. Beasing. I think he is the cashier of the bank and asked him about the payment of my check, and that I had horses in that shipment and wondered what became of my money, the money for these horses." Beasing replied that "He (McConnell) was behind and we got our money while the getting was good." This conversation occurred several days after February 3, 1936. The alleged statement of the cashier of defendant bank was not made while transacting any business relevant to the matter involved in this suit and it relates to a past transaction. It was not admissible. [Savings Bank v. Denker, 275 Mo. 607; Atkinson v. Am. School of Osteopathy et al., 240 Mo. 338; Adams v. Railroad, 74 Mo. 553; City of Chillicothe v. Raynard, 80 Mo. 185; Rhoades v. Robinson's Est., 6 S. W. (2d) 1007, 22 C. J., pp. 379, 387.]

The judgment is reversed and the cause remanded. All concur.